UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARK BUSHBECK, et al., | CASE NO. C08-0755JLR |
| Plaintiffs, | ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CHICAGO TITLE INSURANCE CO., | |
| Defendant. | |

This matter comes before the court on Defendant Chicago Title Insurance Company's ("Chicago Title") motion for summary judgment (Dkt. # 42). Having considered the submissions of the parties, and having heard oral argument, the court GRANTS in part and DENIES in part Chicago Title's motion for summary judgment (Dkt. # 42).

## I.   BACKGROUND

In 2007, Plaintiffs Mark and Raelene Bushbeck refinanced the home which became Mrs. Bushbeck's property when she and her ex-husband, Nicholas Styant-

1  Browne, divorced.  (*See* Fogarty Decl. (Dkt. # 43) Ex. 18 ("R. Bushbeck Dep.") 55:25-

2  56:2.)  The house was collateral in two loans which had been opened by Mr. Styant-

3  Browne:  a first mortgage and a Home Equity Line of Credit ("HELOC"), both held by

4  Countrywide Home Loans ("Countrywide").  (White Decl. (Dkt. # 44), Exs. 6, 7.)  On the

5  advice of their mortgage broker, the Bushbecks retained Chicago Title's office in

6  Bellevue, Washington, to perform the escrow settlement services for their refinance

7  transaction.  (R. Bushbeck Dep. 62:23-63:22.)

8          When real property is refinanced, deeds of trust or liens associated with prior

9  mortgages or loans must be extinguished in a process called reconveyance.  (Compl.

10  (Dkt. # 1) ¶ 13; White Decl. ¶ 6.)  The documentation associated with the Styant-Browne

11  loans indicated that Countrywide would perform the reconveyances.  With respect to the

12  first mortgage, (1) the deed of trust provided that, upon payoff, Countrywide would

13  complete the reconveyance (White Decl. Ex. 2 at 13 ¶ 23), and (2) the payoff statement

14  specified a reconveyance fee of $30.00 and a county recording fee of $32.00 (*Id.* Ex. 6 at

15  1).  With respect to the HELOC, (1) the deed of trust included a provision which Chicago

16  Title understood to mean that Countrywide would perform the reconveyance (White

17  Decl. Ex. 3; Loeser Decl. (Dkt. # 60) Ex. A ("White Dep.") 45:17-46:19), and (2)

18  although the payoff statement did not specify a reconveyance fee, it, like the deed of

19  trust, included language which Chicago Title understood to mean that Countrywide

20  would perform the reconveyance.  (White Decl. Ex. 7; White Dep. 142:18-143:1.)

21          On July 5, 2007, the Bushbecks signed closing documents, including a document

22  entitled "Borrower's Escrow Instructions" (White Decl. Ex. 8 ("Escrow Instructions")),

ORDER- 2

and an "Estimated Settlement Statement" (White Decl. Ex. 9 ("Estimated HUD-1")).  In

relevant part, the Escrow Instructions state the following:

> BORROWER herein deposits with you under these instructions the following:
>
> Loan documents as required by lender.
>
> Estimated Settlement Statement.
>
> Amount required to close, if any.
>
> Which you are instructed to deliver and/or record when you have for the account of the undersigned [$854,750.00]
>
> Subject to any charges and/or credits authorized on the closing statement executed within this closing, and when you are able to comply with the terms and conditions required by
>
> WASHINGTON FEDERAL SAVINGS . . .
>
> . . .
>
> You are instructed to disburse deposited funds pursuant to closing statement(s) examined and approved by the parties hereto and by this reference made a part hereof. Certain items shown on the closing statements may be estimated only and the final figures may be adjusted to accommodate exact amounts required at the time of disbursement.

(White Decl. Ex. 8.)  The Escrow Instructions also provide that Chicago Title "is acting

only as an escrow holder and that it is forbidden by law from offering any advice to any

party respecting the merits of this escrow transaction or the nature of the instruments

utilized, and that it has not done so." *Id.*  In addition, the Escrow Instructions

acknowledge that the borrowers were "requested to seek legal counsel of [their] own

choosing at [their] own expense, if [they had] any doubt concerning any aspect of this

transaction." *Id.*

ORDER- 3

The first page of the Escrow Instructions refers to an attached exhibit, which states the following:

> The parties hereto acknowledge that Washington Federal Savings, the lender herein, may not deposit its loan proceeds until the deed of trust in its favor has been recorded; therefore, escrow will not disburse the total consideration at the time of recording as herein set forth.  Escrow holder is instructed to record all documents, including but not limited to the statutory warranty deed from the purchaser to lender, and to defer all payments and disbursements of funds as set forth herein until such time as escrow holder is in receipt of good and sufficient funds from lender for said loan proceeds.  You are to withhold the recording of all reconveyance and/or releases until such time as the proceeds of this escrow are disbursed in accordance with these instructions.

(*Id.* at 2 ("Escrow Exhibit") (capitalization altered for readability).)

The Escrow Instructions incorporate by reference the Estimated HUD-1, which details the fees the Bushbecks paid into escrow in connection with their refinance. (White Decl. Ex. 9.)  The Estimated HUD-1 reflects that the Bushbecks paid the following fees to Chicago Title:

(1) a settlement or closing fee of $381.15;
(2) a document preparation fee of $163.95;
(3) a "Courier/UPS" fee of $34.14;
(4) $1,002.92 for title insurance; and
(5) a reconveyance fee of $270.00.

(*Id.* at 2.)  The last fee is at issue in this case.  The $270.00 reconveyance fee includes a $135.00 fee for each of the two loans being paid off in the refinance transaction.  (White Decl. ¶ 15.)  For accounting purposes, Chicago Title breaks each $135.00 fee into two components:  a $120.00 reconveyance processing fee and a $15.00 tracking fee.  (*See* White Decl. ¶ 17; White Dep. 48:23-49:1.)  This breakdown is necessary because the tracking portion includes sales tax.  (White Dep. 65:11-66:12; Loeser Decl. Ex. B at 5.)

ORDER- 4

1    At the time of the Bushbecks' refinance, Chicago Title's King County operation charged

2    a reconveyance processing fee for every loan in a refinance transaction.  (*See* Loeser

3    Decl. Ex. B at 1-6.)  Several other Chicago Title operations in Washington, however,

4    either did not charge reconveyance fees or only charged them when the loan files

5    indicated that the lender would not perform the reconveyance.  (*See, e.g.*, *id.* at 7-8

6    (Pierce County); 13-14 (Clark/Cowlitz Counties); 15-16 (Whatcom County).)

7           At the closing meeting, Mr. Bushbeck questioned the Chicago Title representative

8    about the reconveyance fee.  (*See* R. Bushbeck Dep. 73:15-25, 75:1-12; Fogarty Decl.

9    Ex. 19 ("M. Bushbeck Dep.") 41:21-42:9.)  The representative told the Bushbecks that

10   Chicago Title collected the reconveyance fee to cover the cost for Chicago Title to

11   perform and record the reconveyances if the lender failed to complete them; and that any

12   unused portion of the reconveyance fee would be refunded to them.  (R. Bushbeck Dep.

13   74:6-12; M. Bushbeck Dep. 25:20-26:2, 42:23-43:5, 47:1-15.)  Mr. Bushbeck understood

14   the reconveyance fee to be similar to an "insurance policy" to ensure that the

15   reconveyances were completed.  (M. Bushbeck Dep. 48:4-12.)  Based on this

16   understanding and on Chicago Title's statement that it would refund unused

17   reconveyance fees, Mr. Bushbeck "was okay with" paying the reconveyance fee.  (*Id.*

18   25:20-26:2.)  The Bushbecks understood that the reconveyance fee was a separate charge

19   from the settlement or closing fee.  (R. Bushbeck Dep. 91:17-21; M. Bushbeck Dep.

20   57:7-23.)  Although Mr. Bushbeck thought that the reconveyance fee was "excessively

21   high," the Bushbecks did not object to the amount of the reconveyance fee.  (R. Bushbeck

22   Dep. 91:22-25; M. Bushbeck Dep. 59:1-8; 62:4-20.)  Mr. Bushbeck acknowledges that

1   Chicago Title did not promise that they would receive a refund within a specific

2   timeframe; Mrs. Bushbeck does not recall whether Chicago Title made any such promise.

3   (R. Bushbeck Dep. 147:16-24; M. Bushbeck Dep. 82:22-83:4.)

4         The Bushbecks signed the closing documents and were given the mandatory three-

5   day "cooling off" period to reconsider and cancel the transaction.  The Bushbecks did not

6   cancel the transaction, nor did they seek legal counsel with respect to the transaction.  (R.

7   Bushbeck Dep. 83:24-84:5, 101:24-102:4; M. Bushbeck Dep. 56:7-21.)

8         The Bushbecks' refinance closed on July 10, 2007.  After closing, Countrywide

9   completed the reconveyances, and the reconveyances were recorded on August 6, 2007.

10   (White Decl. Ex. 13 at 3, 6.)  It is undisputed that Chicago Title did not perform or record

11   either reconveyance; rather, Countrywide and its agents performed them.  (White Dep.

12   48:3-22, 157:17-158:6.)  It is also undisputed that Chicago Title's Reconveyance

13   Department tracked the reconveyances to ensure that they were completed.  (*See* White

14   Decl. ¶ 22; White Dep. 49:14-21; Resp. at 9.)

15         Because they did not receive a refund of any portion of the reconveyance fee

16   within a few months of closing, the Bushbecks believed that Chicago Title had required

17   the full reconveyance fee.  (*See* R. Bushbeck Dep. 111:2-11; M. Bushbeck Dep. 24:18-

18   25:3.)  The Bushbecks never contacted Chicago Title regarding their reconveyance fee.

19   (R. Bushbeck Dep. 110:16-19; M. Bushbeck Dep. 78:1-13.)

20         On May 14, 2008, the Bushbecks filed the instant class-action lawsuit.  When she

21   learned of the lawsuit, Wendy White, Vice President of Chicago Title and Escrow

22   Manager for Chicago Title's King County operation, pulled the Bushbecks' file and saw

ORDER- 6

1   that Countrywide had completed the reconveyances but that no refund had been issued.

2   (White Dep. 159:17-163:7).  On June 11, 2008, Chicago Title issued refunds of the

3   $120.00 reconveyance processing portions of the Bushbecks' reconveyance fees because

4   Chicago Title did not perform reconveyance processing services.  (White Dep. 49:7-50:6,

5   66:7-12; White Decl. Ex. 13.)  Each refund letter stated, "Also enclosed is our check in

6   the amount of $120 which represents a refund of the reconveyance fee collected at

7   closing.  Because the lender processed the reconveyance we are refunding the

8   reconveyance fee less our tracking fee." (White Decl. Ex. 13 at 2, 5.)  The Bushbecks

9   have not cashed the refund checks.  (*See* M. Bushbeck Dep. 82:11-16.)

10        In March 2008, after Ms. White learned that large residential lenders were

11   performing their own reconveyances, Chicago Title's King County operation stopped

12   charging reconveyance processing fees on loans from these lenders.  (Loeser Decl. Ex. B

13   at 3).  In June 2009, Chicago Title King County stopped charging fees for reconveyance

14   processing altogether.  (*Id.* at 4.)  Chicago Title King County now charges only a $35.00

15   reconveyance tracking fee.  (*Id.* at 4, 6.)

16                              **II.    ANALYSIS**

17        Summary judgment is appropriate if the evidence, when viewed in the light most

18   favorable to the non-moving party, demonstrates that "there is no genuine issue as to any

19   material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

20   P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los*

21   *Angeles*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of

22   showing there is no material factual dispute and that he or she is entitled to prevail as a

ORDER- 7

1  matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, the

2  nonmoving party must go beyond the pleadings and identify facts which show a genuine

3  issue for trial.  *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229

4  (9th Cir. 2000).

5  **A.     Breach of Escrow Contract**

6          Washington follows the objective manifestation theory for interpreting contracts.

7  *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005).  Under this

8  approach, courts attempt to determine the parties' intent "by focusing on the objective

9  manifestations of the agreement, rather than on the unexpressed subjective intent of the

10 parties."  *Id*.  The subjective intent of the parties is thus generally irrelevant if the court

11 can determine the intent from the actual words used.  *Id*.  Courts "give words in a

12 contract their ordinary, usual, and popular meaning unless the entirety of the agreement

13 clearly demonstrates a contrary intent."  *Id*.

14     1.  Contract Terms

15         The Bushbecks allege that Chicago Title breached the escrow contract by:  (1)

16 charging reconveyance fees in addition to the escrow services fee for no additional

17 settlement services other than those Chicago Title was already obligated to perform; and

18 (2) failing to disclose to the Bushbecks that they were not required to use Chicago Title

19 for reconveyance related settlement services and that reconveyance processing was

20 actually being performed by the prior lenders at no charge or for fees separately paid in

21 their loan payoffs.  (Compl. ¶¶ 64, 65.)  In their response to Chicago Title's motion for

22 summary judgment, the Bushbecks restate their breach of contract theory as follows:

ORDER- 8

1    (1) the Escrow Instructions obligated Chicago Title to either perform
2  Plaintiffs' reconveyances or ensure that they occurred, (2) Chicago Title
   was required to follow those same Escrow Instructions because it accepted
3  the $350 escrow services fee, and (3) Chicago Title breached the contract
   by collecting . . . additional reconveyance processing fees and tracking fees
4  for services already covered by the escrow fee.

(Resp. at 12-13.)

     Chicago Title contends that summary judgment is appropriate because the Escrow

Instructions are unambiguous and the Bushbecks cannot identify any term that Chicago

Title breached.  Chicago Title states that the Escrow Instructions directed it to disburse

funds in accordance with the closing statements, including the Estimated HUD-1[1]; that

the Estimated HUD-1 discloses both a closing fee and a separate reconveyance fee; and

that the Bushbecks have not alleged that Chicago Title failed to disburse the escrow funds

as instructed.  In their response, the Bushbecks do not point to any specific terms of the

Escrow Instructions that create the duties they assert; rather, they argue that Chicago Title

has failed to show a "lack of ambiguity in the contract that is required to take this issue

from the trier of fact."  (Resp. at 12-13.)  At oral argument, however, the Bushbecks

asserted that the following passage from the Escrow Exhibit creates an obligation for

Chicago Title to perform the reconveyances in exchange for the closing fee:

    You are to withhold the recording of all reconveyance and/or releases until
such time as the proceeds of this escrow are disbursed in accordance with
these instructions.

---

[1] At oral argument, Chicago Title conceded that the line on the Estimated HUD-1
instructing Chicago Title to disburse reconveyance fees to itself created an additional contractual
obligation for Chicago Title to ensure that the reconveyances had been completed.

ORDER- 9

1   (White Decl. Ex. 8 at 2.)

2        The court finds, reading the Escrow Instructions and the Estimated HUD-1 as a

3   whole, that they are unambiguous and cannot be interpreted as requiring Chicago Title to

4   perform reconveyance services in exchange for the closing fee or to make the disclosures

5   alleged in the Bushbecks' complaint.  Preliminarily, the court notes that a settlement or

6   closing fee typically covers those activities that are required to close the loan transaction.

7   Because reconveyance is not required for closing, but, rather, takes place after closing, a

8   settlement or closing fee does not, without more, cover reconveyance.  *See Cornelius v.*

9   *Fidelity Nat'l Title Co. of Wash.* ("*Cornelius II*"), No. C08-754MJP, 2010 WL 1406333,

10  at *3 (W.D. Wash. April 1, 2010).  The Escrow Exhibit does not alter this rule.  Instead,

11  the Escrow Exhibit instructs Chicago Title to withhold the recording of the reconveyance

12  until after it disburses the escrow proceeds.  Nothing in this passage can be interpreted as

13  requiring Chicago Title to provide reconveyance services in exchange for the closing fee

14  rather than for the reconveyance fee disclosed on the Estimated HUD-1.  Moreover, the

15  Bushbecks testified that they were aware at closing that Chicago Title was charging

16  separate fees for closing services and reconveyance services and that Mr. Bushbeck was

17  "okay with" the reconveyance fee.  (R. Bushbeck Dep. 91:17-21; M. Bushbeck Dep.

18  25:20-26:2, 57:7-23.)  Finally, there is no term in the Escrow Instructions or in the

19  Estimated HUD-1 that mandates any disclosures by Chicago Title.

20       For these reasons, the court grants Chicago Title's motion for summary judgment

21  on the Bushbecks' breach of contract claim to the extent the Bushbecks allege that

22

ORDER- 10

1    Chicago Title was required to perform reconveyance services in exchange for the closing

2    fee and to make the disclosures alleged in the complaint.

3              2.   <u>Duty of Good Faith and Fair Dealing</u>

4              The Bushbecks allege, in the alternative, that if the Escrow Instructions allowed

5    Chicago Title to charge a separate reconveyance fee, then Chicago Title breached its

6    implied duty of good faith and fair dealing by (1) charging a reconveyance processing fee

7    even though it knew that Countrywide would perform the reconveyances; and (2) telling

8    the Bushbecks that it would refund any unused fees and then failing to do so.  Under

9    Washington law, "[t]here is in every contract an implied duty of good faith and fair

10   dealing.  This duty obligates the parties to cooperate with each other so that each may

11   obtain the full benefit of performance."  *Badgett v. Security State Bank*, 807 P.2d 356,

12   360 (Wash. 1991).  The Washington Supreme Court has clarified, however, that

13              the duty of good faith does not extend to obligate a party to accept a
             material change in the terms of its contract.  Nor does it inject substantive
14           terms into the parties' contract.  Rather, it requires only that the parties
             perform in good faith the obligations imposed by their agreement.

15   *Id.* (internal citations and quotation marks omitted).

16              Chicago Title contends that the Bushbecks cannot demonstrate a breach of the

17   duty of good faith and fair dealing because they cannot identify any contractual

18   obligations that relate to their claim.  Chicago Title relies on two recent reconveyance fee

19   cases in this district which rejected similar claims on the ground that there could be no

20   breach of the duty of good faith and fair dealing where the substantive obligation to

21   ensure that the reconveyances were performed was not set forth in the contract:

22

ORDER- 11

1    *Cornelius II*, 2010 WL 1406333, at \*4; and *McFerrin v. Old Republic Title, Ltd.*, No.

2    C08-5309BHS, 2009 WL 2045212, at \*6-7 (W.D. Wash. Jul. 9, 2009).  There is,

3    however, a critical factual difference between these cases and the instant case.  In

4    *Cornelius II* and *McFerrin*, the defendant title companies disbursed the reconveyance

5    fees to third-party vendors which were responsible for tracking the reconveyances; there

6    was no evidence that the defendants had assumed any contractual duty related to

7    reconveyance services.  *Cornelius II*, 2010 WL 1406333, at \*1, \*3; *McFerrin*, 2009 WL

8    2045212, at \*5.[2]  Here, by contrast, Chicago Title did not use the services of a third-party

9    vendor.  Rather, Chicago Title disbursed the reconveyance fee to itself, which, as

10   Chicago Title conceded at oral argument, created a contractual obligation for Chicago

11   Title to ensure that the reconveyances were completed.  As a result, Chicago Title was

12   required to perform this obligation in good faith.

13         Viewing the facts in the light most favorable to the Bushbecks, the court finds that

14   Chicago Title's failure to refund the unused portion of the Bushbecks' reconveyance fee

15   until after they filed their lawsuit misled the Bushbecks into believing that Chicago Title

16   actually performed the reconveyances and required the reconveyance fee.  Because

17   Chicago Title failed to refund the unused fees in a timely manner, the Bushbecks did not

18   receive the full benefit of the contract.  *See Badgett*, 807 P.2d at 360.  The court therefore

19

20   _____

21         [2] Chicago Title also cites *Jankanish v. First Am. Title Ins. Co.*, No. C08-1147MJP, 2009
     WL 779330, at \*2 (W.D. Wash. Mar. 23, 2009).  *Jankanish* is even less persuasive than
22   *Cornelius II* and *McFerrin*, as its holding related only to the failure to disclose claim.  *Jankanish*,
     2009 WL 779330, at \*2.

1   denies Chicago Title's motion for summary judgment on the Bushbecks' claim for breach

2   of the duty of good faith and fair dealing.

3          3.   Voluntary Payment Doctrine

4          Chicago Title contends that the voluntary payment doctrine bars the Bushbecks'

5   contract claims.  The Washington Supreme Court has stated that "money voluntarily paid

6   under a claim of right to the payment, and with full knowledge of the facts by the person

7   making the payment, cannot be recovered back on the ground that the claim was illegal,

8   or that there was no liability to pay in the first instance."  *Indoor Billboard/Wash., Inc. v.*

9   *Integra Telecom of Wash.*, 170 P.3d 10, 23 (Wash. 2007).  The Bushbecks argue that they

10  did not pay the reconveyance fee voluntarily because they did not have full knowledge of

11  the facts that (1) the deeds of trust required Countrywide to perform the reconveyances;

12  (2) Chicago Title had no history of processing reconveyances on Countrywide loans; and

13  (3) Chicago Title would not refund the unused reconveyance processing fees until after

14  they filed a federal lawsuit.  (*See* White Decl. Exs. 6-7; White Dep. 160:12-162:2,

15  177:10-12; 179:13-18.)  Viewing the facts in the light most favorable to the Bushbecks,

16  the court agrees that the voluntary payment doctrine does not bar the Bushbecks' contract

17  claim.

18  **B.     Breach of Estimated HUD-1**

19         The Bushbecks allege that Chicago Title "breached the Estimated HUD-1 by

20  failing to accurately account for the funds disbursed and by failing to disclose that

21  Plaintiffs were not required to use CTI for reconveyance or that lenders were doing the

22  reconveyances for no cost or fees already paid."  (Compl. ¶ 71.)  Chicago Title contends

that an Estimated HUD-1 is not a contract, so there can be no breach.  The Bushbecks do not respond to this argument.

In *Cornelius v. Fidelity Nat'l Title Co.* ("*Cornelius I*"), No. C08-754MJP, 2009 WL 596585, at * 3-4 (W.D. Wash. Mar. 9, 2009), the court held that the HUD-1 was not a contract because there was no evidence of consideration given and no promise contained within the document aside from a representation that what is written is a "true and accurate statement of all receipts and disbursements made" on the escrow account. Similarly, in *Jankanish v. First Am. Title Ins. Co.,* No. C08-1147MJP, 2009 WL 779330, at *2 (W.D. Wash. Mar. 23, 2009), the court held that the settlement statements "do not include terms and conditions, reflect no fee paid as consideration for  a separate HUD-1 contract, and contain no contractual promise to perform (or refrain from performing) some act."  The court agrees with the reasoning of *Cornelius I* and *Jankanish*.  The court therefore grants Chicago Title's motion for summary judgment on the Bushbecks' claim for breach of the Estimated HUD-1.

**C.     Violations of RESPA**

Section 8(b) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, provides:

> (b) Splitting charges.  No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(b).  "The language of Section 8(b) prohibits only the practice of giving or accepting money where no service whatsoever is performed in exchange for that

1  money."  *Martinez v. Wells Fargo Home Mortgage, Inc.*, 598 F.3d 549, 554 (9th Cir.

2  2010).  "By negative implication, Section 8(b) cannot be read to prohibit charging fees,

3  excessive or otherwise, when those fees are for services that were actually performed."

4  *Id.* at 554-55.  A service provider violates Section 8(b) by charging the consumer a fee

5  for which it performs no services; a plaintiff need not demonstrate that the service

6  provider split the fee with another party in order to establish a violation of Section 8(b).

7  *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007).[3]

8          The Bushbecks' Estimated HUD-1 includes a charge for reconveyance fees of

9  $270.00—$135.00 per loan—payable to Chicago Title.  Chicago Title divides each

10  $135.00 reconveyance fee into a $15.00 tracking fee plus a $120.00 processing fee.

11  Although Chicago Title contends that this breakdown is only for internal accounting

12  purposes, the Bushbecks cite a number of examples in which Chicago Title, its

13  representatives, and its attorneys have described the reconveyance fee as consisting of a

14  tracking component and a processing component.  (*See* White Decl. Ex. 13; White Dep.

15  48:23-49:1; Mot. for J. on the Pleadings Hr'g Tr. (Dkt. # 64) 13:1-5, Nov. 11, 2008; *see*

16  

17          [3] The Ninth Circuit has not addressed whether a party can violate Section 8(b) of RESPA
    by charging an unearned fee which is not divided or split with another party.  In a prior order,

18  this court followed the Second Circuit's reasoning in *Cohen* and denied Chicago Title's motion
    to dismiss the Bushbecks' RESPA claim on the basis that the Bushbecks had not alleged a split
    of the unearned fee.  *Bushbeck v. Chicago Title Ins. Co.*, 632 F. Supp. 2d 1036, 1041-42 (W.D.

19  Wash. 2008).  *See also Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384, 389 (3d Cir.
    2005) (holding that a single party can violate Section 8(b) by marking up the charge of another

20  settlement service provider and retaining the unearned portion of the fee); *Sosa v. Chase
    Manhattan Mortgage Corp.*, 348 F.3d 979, 983 (11th Cir. 2003) (same).  Other circuits hold that

21  a plaintiff must allege an illegal split of a fee with a third party in order to establish a RESPA
    violation. *See Haug v. Bank of Am., N.A.*, 317 F.3d 832, 836 (8th Cir. 2003); *Boulware v.
    Crossland Mortgage Corp.*, 391 F.3d 261, 265 (4th Cir. 2002); *Echevarria v. Chicago Title &*

22  *Trust Co.*, 256 F.3d 623, 627 (7th Cir. 2001).

1    *also* Pls. Resp. to Def. Not. of Supp. Auth. (Dkt. # 67) at 2 (listing additional examples).)

2    The parties agree that Chicago Title performed tracking services but did not perform any

3    processing services.  (*See* White Dep. 48:3-22, 49:14-21, 157:19-158:6; White Decl. ¶

4    22; Resp. at 9.)

5         The issue, then, is whether the court, in reviewing the Bushbecks' RESPA claim,

6    should view Chicago Title's reconveyance fee as (1) a unitary $270.00 fee for which the

7    service of reconveyance tracking was performed, or (2) a $15.00 tracking fee per loan for

8    which a service was performed plus a separate $120.00 processing fee per loan for which

9    no service was performed.  If the reconveyance fee is a unitary fee, then the fee was

10   charged for "services actually performed," and there is no RESPA violation.  If, however,

11   the reconveyance fee is comprised of separate tracking and processing fees, then, viewing

12   the facts in the light most favorable to the Bushbecks, Chicago Title may have violated

13   RESPA by collecting a $120.00 processing fee per loan for which it performed no

14   services.  The parties have not directed the court to any law addressing the scenario in

15   which a charge is allegedly comprised of one fee for which the provider performed

16   services and a second fee for which it did not perform services.[4]

17        Chicago Title insists that the court can look no deeper than the $270.00 charge

18   disclosed on the Estimated HUD-1 in determining whether services were performed in

19   exchange for a fee.  Chicago Title's interpretation does not, however, find support in the

20   _____

21   [4] In *Cohen*, the plaintiff alleged that the defendant violated Section 8(b) by charging her a
     "post-closing" fee of $225.00 for which it had provided no services.  *Cohen*, 498 F.3d at 113-14.
22   The court found that a party can violate Section 8(b) by charging a fee for which no work is
     done, and reversed the district court's dismissal of the plaintiff's RESPA claim.  *Id.* at 126.

1   language of Section 8(b).  Section 8(b) specifies that "[n]o person shall give and no

2   person shall accept any *portion, split, or percentage* of any charge . . . other than for

3   services actually performed."  12 U.S.C. § 2607(b) (emphasis added).  This language

4   contemplates that the court will scrutinize the charge disclosed on the HUD-1 to

5   determine whether the defendant accepted any portion, split, or percentage of that charge

6   but performed no services in return.  Interpreting Section 8(b) to prohibit a court from

7   looking deeper than the HUD-1 would render the "portion, split, or percentage" language

8   meaningless.  *See Sosa v. Chase Manhattan Mortgage Corp.*, 348 F.3d 979, 983 (11th

9   Cir. 2003) (noting that a service provider could be culpable as an "acceptor" by accepting

10  an entire fee, knowing that part of it was not for services actually performed).  In

11  addition, a service provider can violate Section 8(b) by splitting a fee with a third party

12  who performs no service, or by marking-up a third-party vendor's fees and keeping the

13  excess without performing any additional services.  *See Kruse v. Wells Fargo Home*

14  *Mortgage, Inc.*, 383 F.3d 49, 61-62 (2d Cir. 2004).  Evaluating a Section 8(b) claim based

15  on these theories requires a court to look beyond the charge disclosed on the HUD-1 to

16  determine how it was actually divided and used.  Chicago Title does not explain why a

17  Section 8(b) claim premised on a service provider's collection of an unearned fee should

18  be treated differently.  The court therefore holds that Section 8(b)'s prohibition against

19  "accept[ing] any *portion, split, or percentage* of any charge . . . other than for services

20  actually performed" is not limited to cases where the service provider performs no

21  services for the entire charge disclosed on the HUD-1, but extends to any portion of the

22  charge for which the service provider does not perform services.

1     Chicago Title contends that Section 8(b) does not authorize courts "to divide a

2  'charge' into what they or some other person or entity deems to be its 'reasonable' and

3  'unreasonable' components."  *Kruse*, 383 F.3d at 56 & n.4 (invalidating a Department of

4  Housing and Urban Development ("HUD") interpretation of Section 8(b) that stated that

5  a service provider violates RESPA by charging a fee that exceeds the reasonable value of

6  goods or services, and noting that Congress provided no guidelines for determining a

7  reasonable charge).  Here, however, the court has not been asked to determine whether a

8  charge was reasonable or to decide what portion of a charge was unreasonable.  Rather,

9  the court is being asked to determine whether a portion of a charge, as determined and

10  described by the service provider itself, was collected other than for services actually

11  provided.

12     Chicago Title cites several cases which it contends support its position that a court

13  cannot parse a settlement service fee into component parts even where that parsing is

14  based on public information.  In each of the three cited cases, the defendant charged the

15  plaintiff a fee for title insurance which exceeded the publicly-filed rates required under

16  Alabama state law.  *Hazewood v. Foundation Fin. Group, LLC*, 551 F.3d 1223, 1224-25

17  (11th Cir. 2008); *Morissette v. NovaStar Home Mortgage, Inc.*, 484 F. Supp. 2d 1227,

18  1228-29 (S.D. Ala. 2007), *aff'd*, 284 F. App'x 729 (11th Cir. 2008); *Williams v. Saxon*

19  *Mortgage Servs., Inc.*, No. 06-0799-WS-B, 2007 WL 1845642, at *1 (S.D. Ala. Jun. 25,

20  2007).  In each case, the plaintiffs argued that because state law prohibited a title

21  insurance company from charging more than the publicly-filed rate, the portion of the

22  title insurance fee which was invalid under state law was a fee for which no services were

ORDER- 18

1    actually performed in violation of RESPA.  In all three cases, the courts disagreed,

2    holding that, because the defendants actually provided title insurance, the excess over the

3    publicly-filed rate constituted a permissible overcharge rather than a fee for which no

4    services were performed.  *Hazewood*, 551 F.3d at 1225-27; *Morissette*, 484 F. Supp. at

5    1230; *Williams*, 2007 WL 1845642, at *4; *see also Arthur v. Ticor Title Ins. Co. of Fla.*,

6    569 F.3d 154, 159 (4th Cir. 2009) (noting that RESPA is not a mechanism for enforcing

7    state law).  Thus, these cases are inapposite, as they involved allegations that the

8    defendants charged too much for a service that was actually performed, rather than an

9    allegation that the defendant collected a fee for which it performed no services.

10           Finally, Chicago Title contends that summary judgment is appropriate because

11   RESPA does not apply to "conditional holdback fees."  The court disagrees.  Whether the

12   reconveyance fee was a "conditional holdback fee" is a question of fact, and the

13   Bushbecks have presented evidence that Chicago Title retained the processing fees

14   despite providing no reconveyance processing services and refunded the processing fee

15   only in response to the Bushbecks' lawsuit.  (White Dep. 159:17-163:8.)

16            Because Section 8(b) prohibits a settlement service provider from "accept[ing]

17   any portion, split, or percentage of any charge . . . other than for services actually

18   performed," and because the evidence, viewed in the light most favorable to the

19   Bushbecks, establishes that Chicago Title charged reconveyance processing fees for

20   which it performed no services, the court, on the record before it, denies Chicago Title's

21   motion for summary judgment on the Bushbecks' RESPA claim.

22

**D.    Breach of Fiduciary and Agency Duties**

In the escrow context, an "escrow agent's duties and limitations are defined . . . by his instructions." *Denaxas v. Sandstone Court of Bellevue, LLC*, 63 P.3d 125, 129 (Wash. 2003) (quoting *Nat'l Bank of Wash. v. Equity Investors*, 506 P.2d 20, 35 (Wash. 1973)).  "The tasks in the instructions must be undertaken with 'ordinary skill and diligence, and due or reasonable care.'" *Id.*  "In addition, the escrow agent, as fiduciary to all parties to the escrow 'must conduct the affairs with which [it] is entrusted with scrupulous honesty, skill, and diligence.'" *Id.*

Chicago Title contends that the economic loss doctrine bars the Bushbecks' claims for breach of fiduciary and agency duties.  The Washington Supreme Court has stated that "the purpose of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses." *Alejandre v. Bull*, 153 P.3d 864, 868 (Wash. 2007).  Accordingly, the doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract because tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Id.* (internal citation and quotation marks omitted).

Here, the Bushbecks allege that Chicago Title breached its duty to act with "scrupulous honesty, skill, and diligence" when it charged a reconveyance processing fee even though (1) the deeds of trust required Countrywide to perform the reconveyances; (2) Chicago Title had instructed Countrywide to perform the reconveyances; and (3) Chicago Title understood that Countrywide would in fact perform the reconveyances.

1    This claim is duplicative of the Bushbecks' contract claim based on the breach of the

2    duty of good faith and fair dealing.[5]  The court therefore holds that the economic loss

3    doctrine bars the Bushbecks' claims for breach of fiduciary and agency duties, and grants

4    summary judgment on these claims to Chicago Title.

5    **E.      Violations of the Washington Consumer Protection Act ("CPA")**

6            To establish a violation of the CPA, chapter 19.86 RCW, a plaintiff must

7    demonstrate: "(1) [an] unfair or deceptive act or practice; (2) occurring in trade or

8    commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or

9    property; (5) causation."  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,

10   719 P.2d 531, 532 (Wash. 1986).  To prove an unfair or deceptive act, the plaintiff need

11   not show that the defendant intended to deceive, but only that the alleged act had the

12   capacity to deceive a substantial portion of the public.  *Id.* at 535.  Although the CPA

13   does not define the term "deceptive," Washington courts have held that "implicit in that

14   term is 'the understanding that the actor *misrepresented* something of material

15   importance.'"  *Stephens v. Omni Ins. Co.*, 159 P.3d 10, 18-19 (Wash. Ct. App. 2007)

16   (quoting *Hiner v. Bridgestone/Firestone, Inc.*, 959 P.2d 1158, 1163 (Wash. Ct. App.

17   1998), *rev'd on other grounds*, 978 P.2d 505 (Wash. 1999)).  In addition, "[a] loss of use

18   of property which is causally related to an unfair or deceptive act or practice is sufficient

19   injury to constitute the fourth element of a Consumer Protection Act violation."  *Id.* at 25

20   (quoting *Mason v. Mortgage Am., Inc.*, 792 P.2d 142, 148 (Wash. 1990)).

21   _____

22          [5] At oral argument, counsel for the Bushbecks stated that the claims for breach of contract
     and breach of fiduciary duty were "pled and argued in the alternative."

1          Chicago Title argues that there can be no unfair or deceptive act where a fee was

2    disclosed "up front" during a transaction; that the Bushbecks cannot show harm because

3    they received a refund; and that it acted in good faith under an arguable interpretation of

4    the law.  Preliminarily, the court takes a dim view of Chicago Title's contention that, by

5    issuing a refund in reaction to the Bushbecks' lawsuit (*see* White Dep. 159:17-163:8), it

6    eliminated its liability under the CPA.  Moreover, as explained above, the Bushbecks

7    have presented evidence supporting their allegations that Chicago Title committed unfair

8    or deceptive acts and acted in bad faith when it collected the reconveyance processing

9    fees despite knowing that Countrywide would perform the reconveyances, promised that

10   it would refund the fees if they were not used, and then failed to refund the unused fees

11   until after the Bushbecks filed their lawsuit.  Thus, viewing the facts in the light most

12   favorable to the Bushbecks, the court holds (1) that Chicago Title's practice of collecting

13   reconveyance processing fees that it knew it would not use and then failing to refund the

14   unused reconveyance processing fee may constitute an unfair or deceptive act that caused

15   injury under the CPA, and (2) that the Bushbecks have established a genuine issue of

16   material fact regarding whether Chicago Title acted in good faith.  The court therefore

17   denies Chicago Title's motion for summary judgment on the Bushbecks' CPA claims.[6]

18

19            [6] The Bushbecks also argue that Chicago Title committed a per se violation of the CPA
20   by violating the Washington Insurance Code ("WIC").  "A per se unfair trade practice exists
     when a statute which has been declared by the Legislature to constitute an unfair or deceptive act
21   in trade or commerce has been violated."  *Hangman Ridge*, 719 P.2d at 535.  Although the WIC
     states that the business of insurance is one "affected by the public interest," RCW 48.01.030, the
22   Bushbecks have not identified any statute declaring that Chicago Title's alleged actions in this
     case constitute per se unfair or deceptive practices.

ORDER- 22

1

### III.    CONCLUSION

2          For the foregoing reasons, the court GRANTS in part and DENIES in part

3    Chicago Title's motion for summary judgment (Dkt. # 42).

4          Dated this 1st day of June, 2010.

5

6                                                          _____

7                                                          JAMES L. ROBART
                                                           United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22